UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERRANCE LEO BOLTON,

               Petitioner,

     v.

LELAND McEWEN, Acting Warden,

               Respondent.

_____/

No. C 09-4266 SI (pr)

**ORDER DENYING HABEAS PETITION AND DENYING CERTIFICATE OF APPEALABILITY**

**INTRODUCTION**

     Terrance Leo Bolton, a prisoner of the State of California, filed this habeas action under 28 U.S.C. § 2254 to challenge his 2006 conviction in the Contra Costa County Superior Court. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition is denied.

**BACKGROUND**

**I.    The Crimes**

     The Contra Costa County District Attorney charged Bolton by information with one count of first degree murder (California Penal Code § 187[1]), and included the enhancing allegation that Bolton used a deadly and dangerous weapon in the commission of the crime (§ 12022, subd.

---

[1] Unless otherwise specified, further statutory references are to the California Penal Code.

1   (b)(1)).

2       The California Court of Appeal set out the facts:

3       ***The Trial Evidence***

4           On February 24, 2004,[2] Michelle Barfield, Bolton's wife, died in a park in
    Richmond after being stabbed 27 times. She and Bolton had been separated since
5   November 2003. They had an infant son who was born in July 2002.

6           At the time of the incident, Bolton was living in Berkeley with his mother,
    brothers, and 17-year-old sister J. J. testified[3] Bolton told her in October 2003 that
7   he wanted to kill Michelle. Bolton repeated this sentiment to her on February 24th
    during a walk near their home, though he did not use the word "kill." He told J.
8   he wanted to end his relationship with Michelle, and said he would "[e]ither stab
    [her] or have somebody else do it . . . [b]y gun." J. did not believe him, and did
9   not take him seriously on either occasion. During the February 24th walk, he
    asked J. to come with him to pick up the baby from Michelle, and J. agreed to.

10
11          Bolton and J. returned to their home, where J. went upstairs. When she
    came downstairs, she heard a kitchen cabinet slam and then saw Bolton heading
12  toward the front door. She saw Bolton putting something in his jacket pocket that
    looked like gloves. Their stepfather kept latex gloves in the kitchen.

13          J. and Bolton left their home in Berkeley together. Bolton was wearing a
    black puffy coat with a "Fat Albert" logo on the back. They took public transit to
14  Richmond, where Bolton was going to pick up his son from Michelle. Bolton had
    called Michelle earlier, and arranged to pick up the baby in a park close to her
15  home. They had been exchanging custody of the baby on an informal basis since
    their separation, but had never done so at a park.
16
17          When Bolton and J. were near the Barfield home, Bolton called Michelle
    to see if she was ready. He told Michelle he had a surprise for her, and that J.
18  would pick her up at her house because she needed to use the restroom. J. went
    alone to the Barfield home, arriving at about 8:00 p.m. She was a friend of
19  Michelle's, and often visited her. Michelle's brother Christopher Barfield
    (Christopher)[4] was at home that evening, and heard J. "rushing [Michelle] out of
20  the house," telling her "'hurry up because my brother is around the corner
    waiting.'" Michelle left with J. at about 8:15 p.m., carrying her infant son and two
21  diaper bags.

22          Approximately 20 minutes later, Christopher answered the telephone at the

23  _____

        [2] All further undesignated dates are in 2004.
24
        [3] J. made a statement to police and testified as part of an agreement with the prosecution,
25  after she was charged with first degree murder. Under this agreement, she would remain under
    the jurisdiction of the juvenile court, "[m]eaning at wors[t she] would be incarcerated in a
26  juvenile facility up to the age of 25 maximum. . . ."

27          [4] Because a number of individuals referenced in this opinion share the same last name,
    we refer to them by their first names, where appropriate, for clarity. (See Rubenstein v.
28  Rubenstein (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

**United States District Court**
For the Northern District of California

Barfield home.  He recognized Bolton's voice, who told him that "some dudes hopped out of a van and jumped [Michelle]" and J. at the park, and Michelle was knocked out.  Bolton agreed to meet him at the park.  Christopher expressed his surprise that Bolton did not protect Michelle, telling him "'Somebody jumped your girl at the park . . . [y]ou aren't going to protect her?' . . . 'Man[,] tell my momma what you just told me.'"  Christopher handed the phone to his mother, who spoke with Bolton.  Barfield family members immediately got in their van and drove to the park, which was around the corner from their home.

They arrived at the park in seconds, but it took about five minutes of searching to find Michelle.  Christopher was the first to find her, lying on her chest in the sandbox.  He rolled her over to see if she was alive, but she "had no life."  He found the two diaper bags and Michelle's hair extensions, bandana and glasses nearby.  His mother called police on her cell phone.

J. testified that when she and Michelle arrived at the park, Bolton was there and took the baby from Michelle.  He then handed the baby to J., and she started to walk toward the home of her grandmother, Billie Feathers, where Bolton had asked her to take him.  Michelle told her she should not walk there alone at night with the baby, so J. waited with him on a bench.

Bolton and Michelle talked for about 10 minutes, though J. could not hear what they were saying.  They did not appear to be angry.  The conversation ended, and they walked towards J.  Michelle hugged the baby, J. and Bolton.  J. left in the direction of Feathers's house, and Bolton said he would catch up with her.

J. turned around, and saw Bolton grab Michelle's hand.  As she was walking away with the baby, she heard Michelle "ask [Bolton] what was wrong with him."  She turned around again, and saw Bolton "pull Michelle towards him" by the hand.  Michelle continued to ask him what he was doing in a "scared" tone.  J. saw Bolton "stumble towards" Michelle, and she turned around because she "didn't know what else to do at that point," and was a "little scared and shocked."  When she turned back around to face them, "[i]t just looked as if [Bolton] was punching her."  She heard Michelle say "Terrance, stop."  J. stood there with the baby in her arms.  She then heard Michelle say "J[.], help."  J. "froze up" and saw Michelle on the ground, extending her hand toward her.  J. did not try to help her.  She walked toward Feathers's house with the baby, and saw Bolton about 50 feet ahead of her.

Bolton arrived first at Feathers's home.  Melinda Bailey, Feathers's daughter, answered the door, and observed Bolton dabbing one of his hands with a tissue.  She asked him what was wrong, and Bolton told her he had fallen on some glass and cut himself.  Bolton then went into the bathroom.  J. and the baby arrived at Feathers's home 10 or 15 minutes later.  After she sat down on the coach [sic] with the baby, Bolton came out of the bathroom.  He was holding his jacket and had some tissue wrapped around his finger.  Neither Bolton nor J. told anyone at the house about what just happened.

Bailey had given Bolton and J. a ride the previous night, and she did not want to again.  She asked her daughter to bring out a bus schedule for them.  Bolton left the house after about 15 minutes, tossing a tissue into the trash can in the living room.  J. followed a few minutes later with the baby.

J. and Bolton walked together to the home of Eddie Dorsey, their mother's

cousin. Along the way, Bolton told J. to say Michelle had been attacked by strangers while she and J. were walking to the park. Bolton also told her that "a gun would [have] be[en] faster" than the knife, because the stabbing was "difficult." When they arrived at Dorsey's home, Bolton asked him for medicine for his hand, and then went to the bathroom for a tissue. Bolton called home, and while holding the phone told J. that Michelle's mother had called their mother and said Michelle was dead. Their mother told them to stay at Dorsey's house until Bailey picked them up.

Bailey arrived a few minutes later and then drove Bolton, J. and the baby to the Bolton home in Berkeley to pick up Bolton's mother, Valerie Cook. Bolton went into the house. When he came back, he no longer had the "Fat Albert" jacket. They drove to the Richmond police station, arriving there at about 10:15 p.m.

Detectives Peixoto and Medina interviewed Bolton at the police station, beginning at about 3:00 a.m. The detectives noted the cuts on his right hand. Bolton told them he received one of them when he cut his finger on a knife while doing dishes earlier that evening, and stated he was right-handed. He told the detectives that he was going to meet Michelle in the park that evening to pick up his son. He "went to the store, and she called me up and said she was on her way. I was on my way to the store and I seen my sister J[.] running. . . . She said somebody was doing something to my wife Michelle, you know. It's just crazy, man. And so I ran to my granny['s] house to get a ride."

The detectives told him J. was also being interviewed, and asked him if she would tell them the same story. After leaving the room and returning, the detectives told Bolton that J. had implicated him. Bolton ultimately admitted that he killed Michelle, stabbing her seven times. He said she had been "playing with [his] heart," had a new job, a new boyfriend, and had told the baby he had "a new daddy." Bolton said he had brought a knife and gloves with him that night, and told them where he disposed of them.

Officer Mandell found the gloves and knife where Bolton had indicated. The gloves were "a white pair of standard medical gloves" with a knife wrapped inside. The gloves had blood on them, with a DNA profile matching that of Michelle. One of the gloves had perforations on the index finger, the area of the thumb joint, and on either the palm or back of the glove, depending on the configuration. Police also recovered the "Fat Albert" jacket from Bolton's home. Police criminalists took and tested swabs from areas of apparent blood on the jacket. The DNA profile showed that Michelle was the major contributor of the blood on three of the samples from the jacket. One of the samples from the jacket had a DNA profile consistent with Bolton's.

Cal. Ct. App. Opinion, pp. 2-6 (footnotes renumbered).

## II.   **Procedural History**

On November 21, 2006, a Contra Costa County jury found Bolton guilty of first degree murder for killing his estranged wife, Michelle Barfield, and found true the enhancing allegation

that in committing the crime Bolton personally used a deadly and dangerous weapon, a pocket knife.

On January 25, 2007, Bolton was sentenced to twenty-five-years-to-life imprisonment for the first degree murder, and one year for the enhancing allegation, to be served consecutively.

On September 4, 2008, Bolton's conviction was affirmed by the California Court of Appeal. On November 17, 2008, his petition for review was denied by the California Supreme Court. He did not seek collateral review in the state courts.

Bolton then filed this action on September 15, 2009. In his petition, Bolton asserted four claims that the court found cognizable and ordered respondent to answer: (1) his rights to due process were violated by the trial court's refusal to instruct the jury that his sister was an accomplice as a matter of law; (2) his right to due process was violated by the lying-in-wait jury instruction used at trial; (3) the admission at trial of his taped inculpatory statements taken involuntarily and without a <u>Miranda</u>[5] waiver violated his constitutional rights; and (4) cumulative error. The court issued an order to show cause on February 12, 2010.

Respondent filed an answer to the petition.[6] Bolton filed a traverse. The case is now ready for review on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns a conviction obtained in Contra Costa County, which is in this district. <u>See</u> 28 U.S.C. §§ 84, 2241(d).

---

[5] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[6] Bolton named Larry Small, former warden of the Calipatria State Prison in Calipatria, California, as the respondent in this action. Leland McEwen, the current acting warden, has been substituted as Respondent in place of Bolton's prior custodian pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

*United States District Court*
*For the Northern District of California*

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A

6

1    federal habeas court making the "unreasonable application" inquiry should ask whether the state

2    court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

3

4                                          **DISCUSSION**

5    I.    **Due process claims based on alleged misstatement of the law in the jury instructions**

6          A.    **Trial court's failure to instruct jury with CALJIC No. 3.16**

7          Bolton claims that the trial court violated due process because it failed to instruct the jury

8    that his sister, J., was an accomplice as a matter of law.

9          The California Court of Appeal described the background of this claim as follows:

10               Bolton argues that the court erred in instructing the jury that he bore the
         burden of proving that J. was an accomplice (CALJIC No. 3.19), rather than
11       instructing she was an accomplice as a matter of law (CALJIC No. 3.16). He
         urges that "[t]here was very little if any corroboration of J.'s testimony,
12       particularly regarding premeditation and deliberation," rendering the claimed error
         prejudicial because "[t]he jury may well have found that J[.] was not an
13       accomplice and, therefore, they were entitled to convict [him] of first degree
         murder on her testimony alone."
14
                 "A conviction cannot be had upon the testimony of an accomplice unless
15       it be corroborated by such other evidence as shall tend to connect the defendant
         with the commission of the offense; and the corroboration is not sufficient if it
16       merely shows the commission of the offense or the circumstances thereof. [¶] An
         accomplice is hereby defined as one who is liable to prosecution for the identical
17       offense charged against the defendant on trial in the cause in which the testimony
         of the accomplice is given." (§ 1111.)   Corroborating evidence that satisfies
18       section 1111 "must tend to implicate the defendant by relating to an act that is an
         element of the crime. The corroborating evidence need not by itself establish
19       every element of the crime, but it must, without aid from the accomplice's
         testimony, tend to connect the defendant with the crime. [Citation.]" (People v.
20       McDermott (2002) 28 Cal.4th 946, 986; In re Christopher B. (2007) 156
         Cal.App.4th 1557, 1560-1561.)  "Corroborating evidence is sufficient if it tends
21       to implicate the defendant and thus relates to some act or fact that is an element
         of the crime. . . . '"[T]he corroborative evidence may be slight and entitled to little
22       consideration when standing alone." [Citations.]' [Citation.]"  (People v. Avila
         (2006) 38 Cal.4th 491, 562.)  A trial court's failure to instruct on accomplice
23       liability under section 1111 is harmless if there is "sufficient corroborating
         evidence in the record. [Citation.]" (People v. Lewis (2001) 26 Cal.4th 334, 370.)
24
                 Here, the trial court instructed the jury that "[y]ou cannot find a defendant
25       guilty based upon the testimony of an accomplice unless that testimony is
         corroborated by other evidence which tends to connect that defendant with the
26       commission of the offense." (CALJIC No. 3.11.)  The court also instructed the
         jury that "You must determine whether the witness [J.] was an accomplice as I
27       have defined that term.  [¶]  The defendant has the burden of proving by a
         preponderance of the evidence that J[.] was an accomplice in the crime charged
28       against the defendant." (CALJIC No. 3.19.)  The court further instructed the jury

United States District Court
For the Northern District of California

7

United States District Court
For the Northern District of California

1   with CALJIC No. 3.12 regarding the sufficiency of the evidence needed to
2   corroborate an accomplice, and CALJIC No. 3.18, regarding the care and caution
    necessary in examining the testimony of an accomplice.

3       Bolton contends the jury might have found that J. was not an accomplice
4   and, therefore, convicted him of first degree murder based solely on J.'s testimony.

5   Cal. Ct. App. Opinion, ¶. 6-7.

6       The California Court of Appeal found that any error in failing to instruct that J. was an

7   accomplice as a matter of law was harmless, stating:

8       "[F]ailure to instruct on accomplice liability under section 1111 is harmless if
        there was adequate corroboration of the witness."  (<u>People v. Brown</u> (2003) 31
9       Cal.4th 518, 557.)  While the trial court did not instruct the jury that J. was an
        accomplice as a matter of law, the prosecutor told the jury she was in his closing
10      argument.  Rather than arguing that J. was not an accomplice and therefore no
        corroboration of her testimony was needed, he explained to the jury that "you need
11      to have corroboration before you can consider J[.]'s testimony."

12      Additionally, as argued by the prosecutor, there was extensive evidence
        corroborating J.'s testimony.  Notably, Bolton confessed to the murder and told
13      police where he disposed of the knife and gloves, which had Michelle's blood on
        them.  "'Admissions or confessions of an accused may constitute a sufficient
14      corroboration of the accomplice's testimony to warrant conviction.' . . ."  (<u>People
        v. Newman</u> (1954) 127 Cal.App.2d 430, 435, citing 22 C.J.S. 1403.)  There was
15      other corroboration as well.  Michelle's brother Christopher testified that Michelle
        went to the park the evening of February 24th to meet Bolton and exchange
16      custody of their child.  Bolton called Michelle's home after the killing and told
        Christopher that some "dudes" had "jumped" Michelle and he had left her
17      "knocked out" in the park, placing him in the park at the time of the killing.  Police
        found Michelle's blood on the "Fat Albert" jacket J. testified that Bolton wore the
18      night Michelle was killed, and on the knife police found after Bolton directed
        them to its location.  Given the slight amount of corroboration necessary and the
19      extensive amount in the record, any error in failing to instruct that J. was an
        accomplice as a matter of law was harmless.
20
21  Cal. Ct. App. Opinion, ¶. 7-8.

22      To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

23  the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

24  process.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991).  The instruction may not be judged in

25  artificial isolation, but must be considered in the context of the instructions as a whole and the

26  trial record.  <u>See</u> <u>id.</u>  In reviewing a faulty instruction, the court inquires whether there is a

27  "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates

28  the Constitution.  <u>Id.</u> at 72, n.4.

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. See Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).

Even if there is an instructional error, a habeas petitioner is not entitled to relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted). If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. O'Neal v. McAninch, 513 U.S. 432, 437 (1995). Further, federal court's review of a claim of instructional error is subject to a highly deferential standard of review. Masoner v. Thurman, 996 F.2d 1003, 1006 (9th Cir. 1993).

Here, this court finds no basis for disturbing the conclusions of the state appellate court. Assuming there was error in the trial court failing to instruct that J. was an accomplice as a matter of law, any such an error was harmless in light of the extensive amount of corroboration present in the record to warrant Bolton's conviction. Any such error clearly did not "so infect[] the entire trial that the resulting conviction violate[d] due process." Id. Therefore, there was no constitutional violation.

The California Court of Appeal's rejection of Bolton's due process claim -- relating to CALJIC No. 3.16 -- was not contrary to, or an unreasonable application of, clearly established federal law.

Accordingly, Bolton is not entitled to habeas relief based on this claim.

**B.     Trial court's error in instructing jury with CALJIC No. 8.25**

Bolton claims that he was denied due process because there was insufficient evidence for

the trial court to instruct the jury with CALJIC No. 8.25, the lying-in-wait jury instruction.

The California Court of Appeal outlined the background of this jury instruction claim, and rejected it, as follows:

> Bolton asserts that the court erred in instructing the jury on lying in wait as a basis for finding first degree murder, claiming the instruction was not supported by the evidence. He argues there was no evidence of a "surprise attack from a position of advantage any more than there would be in any homicide in which one person kills the other after talking to him or her for several minutes." We review the record to determine whether there was substantial evidence of lying in wait, and, accordingly, whether the trial court properly instructed the jury. (People v. Ceja (1993) 4 Cal.4th 1134, 1139, fn. 1.)

> Murder which is perpetrated by means of lying in wait is first degree murder. (§ 189; People v. Ceja, supra, 4 Cal.4th at p. 1139.) The elements of "lying in wait" are "(1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage" (the Morales factors). (People v. Morales[7] (1989) 48 Cal.3d 527, 557 (Morales); § 190.2, subd. (a)(15).) "The concealment which is required, is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." (Morales, supra, 48 Cal.3d at ¶. 554-555.) The critical component of lying in wait is "the waiting of a defendant for the opportunity to take the victim by surprise by concealing his murderous purpose in order to gain the advantage of ambush or surprise." (People v. Superior Court (Jurado) (1992) 4 Cal.App.4th 1217, 1227.) "[T]he Morales factors, including the requirement of a 'substantial period' of watching and waiting, are a part of the factual matrix required both for first degree murder under a lying-in-wait theory, and for the lying-in-wait special circumstance."[8] (Poindexter, supra, 144 Cal.App.4th at ¶. 584-585, fn. omitted.)

> The court instructed the jury on lying in wait with CALJIC No. 8.25 as follows: "Murder which is immediately preceded by lying in wait is murder of the first degree. [¶] The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush *or by some other secret design to take the other person by surprise, even though the victim is aware of the murderer's presence.* The lying in wait need not continue for any particular period of time, provided its duration is such as to show a state of mind equivalent to premeditation or deliberation." (Italics added.)

---

[7]  "Although [CALJIC No. 8.25] does not verbatim track our language in [Morales], . . . we have repeatedly upheld the instruction, and continue to do so. [Citations.]" (People v. Ceja, supra, 4 Cal.4th at p. 1139, see also People v. Poindexter (2006) 144 Cal.App.4th 572, 581 (Poindexter).

[8]  The difference between the lying-in-wait special circumstance and lying-in-wait first degree murder is that in the special circumstance, the murder must be intentional, while to establish lying-in-wait first degree murder, it need not be. (§ 190.2, subd. (a)(15); see also People v. Superior Court (Bradway) (2003) 105 Cal.App.4th 297, 306-307.)

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13

        Bolton challenges the sufficiency of the evidence to support the lying-in-wait instruction only in regard to the "surprise attack from a position of advantage" factor, claiming there was no evidence of a surprise attack "any more than there would be in any homicide in which one person kills the other after talking to him or her for several minutes." "Lying in wait does not require that a defendant launch a surprise attack at the first available opportune time. [Citation.] Rather, the defendant 'may wait to maximize his position of advantage before taking his victim by surprise.' . . ." (People v. Lewis (2008) 43 Cal.4th 415, 510, citing People v. Hillhouse (2002) 27 Cal.4th 469, 501.)  We considered similar factual circumstances in Poindexter, supra, 144 Cal.App.4th at pages 585-586. There, "defendant and the victim were engaged in a verbal altercation on a public street, with several other individuals in the vicinity.  Defendant told the victim something to the effect of 'I'll show you what I mean,' and 'stay here if you want to live.'  Defendant then walked to a nearby garbage can, retrieved a shotgun, and returned to the victim within a minute.  He carried the shotgun in plain view, pointed down.  He said something to the victim, who replied, 'It's not that serious.'  Defendant then quickly shot the victim three times with the shotgun . . . ." (Poindexter, supra, 144 Cal.App.4th at ¶. 585-586, fn. omitted.)  The court found a reasonable jury could conclude that all the Morales factors were present.  The defendant concealed his purpose with the subterfuge of telling the victim to "stay here if you want to live." (Id. at p. 585.)  The elapsed period of time was sufficient to "show a state of mind consistent with premeditation or deliberation." (Id. at p. 586, fn. omitted.)  Finally, the defendant returning with the gun to kill the victim was a "surprise attack on an unsuspecting victim from a position of advantage." (Id. p. 586, fn. 23.)

14
15
16
17
18
19
20

        The "surprise attack from a position of advantage" requirement does not mean that the victim must be unaware of defendant's presence.  In People v. Combs, the court held that the evidence "amply" supported the lying-in-wait special-circumstance finding where defendant devised a ruse about needing a ride to trick the victim into driving him to the desert.  Defendant sat in the backseat behind the victim with cords that he had obtained earlier, waiting for an opportune time to kill her.  After the victim parked the car, defendant surprised her by placing the electrical cord over her head and strangling her. (People v. Combs (2004) 34 Cal.4th 821, 853-854.) Likewise in Morales, the court found sufficient evidence of lying in wait where the defendant sat behind the victim in a car, waited until the car was in a more deserted location, and then killed her. (Morales, supra, 48 Cal.3d at ¶. 554-555.)

21
22
23
24
25

        Here, Bolton "concealed his murderous intention" by luring Michelle to the park at night under the guise of exchanging custody of their baby.  He sent his sister J. to pick up Michelle, knowing that they were friends and Michelle would not suspect anything amiss.  Bolton talked to Michelle for about 10 minutes, apparently amiably, in the park.  After she said her goodbyes, hugging Bolton, J., and the baby, he attacked her.  This plainly took Michelle by surprise, after she had just engaged in a friendly encounter with Bolton and J.  Bolton waited until Michelle had handed over the baby and thought she was saying a friendly good-bye to stab her, "'"maximiz[ing] his position of advantage before taking his victim by surprise."' [Citation.]" (People v. Lewis, supra, 43 Cal.4th at p. 510.)

26
27

        The record demonstrates substantial evidence of Bolton lying in wait.  The court did not err in instructing the jury with CALJIC No. 8.25.

28

Cal. Ct. App. Opinion, ¶. 8-11 (footnotes renumbered).

11

United States District Court
For the Northern District of California

1    Bolton claims that the lying-in-wait jury instruction, CALJIC No. 8.25, violated his right

2    to due process because there was no evidence to support that theory of guilt.   Giving an

3    instruction which is not supported by the evidence is not a due process violation.  Griffin v.

4    United States, 502 U.S. 46, 55-60 (1991).  This is because a jury is well-suited to determining

5    whether there is any evidence to support an instruction, which is not true when an instruction is

6    legally erroneous; hence there may be a violation of due process when a trial court gives both

7    a legally erroneous instruction and one which is not legally erroneous, but it is otherwise when

8    one theory is supported by the evidence and one is not.  In that situation, submission of an

9    alternative theory which is not supported does not violate due process.  See id. at 59.  Here, the

10   trial court instructed the jury on another theory of first degree murder -- premeditation -- which

11   was supported by substantial evidence.   Thus, given that there was abundant evidence of

12   premeditation, inclusion of the lying-in-wait instruction could not have made the trial

13   "fundamentally unfair" so as to violate due process.  See Estelle, 502 U.S. at 72.  Therefore,

14   Bolton's due process rights were not violated.

15       Furthermore, the California Court of Appeal explained that under California law: "Murder

16   which is perpetrated by means of lying in wait is first degree murder."  Cal. Ct. App. Opinion,

17   p. 8.  As explained above, the state appellate court set forth the elements of lying-in-wait: "(1) a

18   concealment of purpose, (2) a substantial period of watching and waiting for an opportune time

19   to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position

20   of advantage."  Id.  Bolton argued that the evidence of lying in wait was insufficient here

21   because there was "no surprise attack from a position of advantage any more than there would

22   be in any homicide in which one person kills the other after talking to him or her for several

23   minutes."  (Traverse at 10.)  Bolton's argument rests on the assumption that California law

24   requires the prosecution to prove that the defendant's attack was somehow more surprising than

25   "any homicide in which one person kills the other after talking to him or her for several

26   minutes."  This is not the law.  The state appellate court clarified the law, stating: "Lying in wait

27   does not require that a defendant launch a surprise attack at the first available opportune time.

28   [Citation.]  Rather, the defendant 'may wait to maximize his position of advantage before taking

his victim by surprise.'" Cal. Ct. App. Opinion, p. 10.  The state appellate court also explained that CALJIC No. 8.25 has been "repeatedly upheld" as setting forth a correct statement of California law.  Id. at 8 note 6 (citing People v. Ceja, 4 Cal.4th 1134, 1139 (1993).  A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485 U.S. 624, 629 (1988) (even a determination of state law made by an intermediate appellate court must be followed).  The California Court of Appeal's explanation and interpretation of state law that first-degree murder under a lying-in-wait theory does not require the evidence Bolton refers to -- i.e., an attack more surprising than "any homicide in which one person kills the other after talking to him or her for several minutes" -- is binding on this court on federal habeas review.  Thus, Bolton's claim that the instruction violated his right to due process is premised an interpretation of state law that has been rejected by the state courts, an interpretation that is binding herein.  As the instruction was not erroneous in the manner Bolton claims, his claim of a due process violation based on such instructional error fails.  Accordingly, Bolton is not entitled to federal habeas relief on this claim.

Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict.  Brecht, 507 U.S. at 637.   In this case, where the jury could have convicted Bolton of first degree murder on a premeditation theory had it never been instructed on lying in wait and where the evidence of guilt itself was overwhelming, any error was indeed harmless.

The state appellate court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.  This claim therefore cannot serve as a basis for habeas relief.

## II.   Claimed error in admitting Bolton's taped statement/confession

Bolton contends that the trial court violated his constitutional rights by admitting his confession.  His claim rests on two grounds: (1)  that the confession was involuntary, and (2) that he did not waive his Miranda rights. (Traverse at 13-17.)  Both arguments fail, as explained

below.

### A.   <u>Involuntary</u>

In <u>Miranda</u>, the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence.  <u>Miranda</u> and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts.  384 U.S. at 443-45.

According to the record, Bolton was read his <u>Miranda</u> rights by Detective Mitchell Peixoto of the Richmond Police Department at the start of his interview on February 25, 2004 at 3:06 AM.  RT 525-526.  Bolton indicated to Detective Peixoto and Detective Medina, who was also present, that he understood his rights.  RT 526.

Where a <u>Miranda</u> waiver is concerned, the voluntariness prong and the knowing and intelligent prong are two separate inquiries.  <u>Derrick v. Peterson</u>, 924 F.2d 813, 820-24 (9th Cir. 1990).  Once properly advised of his rights, any waiver must be given voluntarily, knowingly and intelligently.  <u>Miranda</u>, 384 U.S. at 475.  The distinction between a claim that a <u>Miranda</u> waiver was not voluntary, and a claim that such waiver was not knowing and intelligent, is important.  <u>Cox v. Del Papa</u>, 542 F.3d 669, 675 (9th Cir. 2008).  The voluntariness component turns on the absence of police overreaching, i.e., external factors, whereas the cognitive component depends upon the defendant's mental capacity.  <u>Ibid.</u>

To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-27 (1973).  "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing <u>Haynes v. Washington</u>, 373 U.S. 503, 513-14 (1963)).  Relevant factors in considering the totality of the circumstances include the existence of police coercion, the length of the interrogation, the location of the interrogation, the continuity of the interrogation, and the defendant's maturity, education, physical condition, and mental health.

United States District Court
For the Northern District of California

1   <u>Withrow v. Williams</u>, 507 U.S. 680, 693 (1993) (citations omitted).  Courts have also considered

2   as indicative of coercion the repeated and prolonged nature of the questions, <u>see, e.g.</u>, <u>Ashcraft</u>

3   <u>v. Tennessee</u>, 322 U.S. 143 (1944); the use of physical punishment such as the deprivation of

4   food or sleep, <u>see, e.g.</u>, <u>Reck v. Pate</u>, 367 U.S. 433 (1961); and the use of promises or threats of

5   violence, <u>see, e.g.</u>, <u>Leon Guerrero</u>, 847 F.2d at 1366.  However, "the significant fact about all

6   of these decisions is that none of them turned on the presence or absence of a single controlling

7   criterion; each reflected a careful scrutiny of all the surrounding circumstances."  <u>Schneckloth</u>,

8   412 U.S. at 226.

9       Here, the state appellate court rejected Bolton's claim that his confession was involuntary,

10  stating:

11         Bolton maintains that his statement to police should have been excluded as
12  involuntary because the interrogation was lengthy, coercive, and included
    "incessant" demands to admit he killed Barfield.  When an interrogation is
13  recorded, as it was here, the facts surrounding the giving of the statement are
    undisputed, and we independently review the determination of the trial court on
14  the ultimate issue of voluntariness.  (<u>People v. Maury</u> (2003) 30 Cal.4th 342, 404;
    see also <u>People v. Jones</u> (1998) 17 Cal.4th 279, 296.)

15         "'What the Constitution permits to be admitted in evidence is "the product
16  of an essentially free and unconstrained choice . . ." to confess. . . .  The question
    is whether defendant's choice to confess was not "essentially free" because his will
17  was overborne.' . . ."  (<u>People v. Jones</u>, <u>supra</u>, 17 Cal.4th at p. 296, citing <u>People</u>
    <u>v. Memro</u> (1995) 11 Cal.4th 786, 827.)  "'Once a suspect has been properly
18  advised of his rights, he may be questioned freely so long as the questioner does
    not threaten harm or falsely promise benefits.  Questioning may include exchanges
19  of information, summaries of evidence, outline of theories of events, confrontation
    with contradictory facts, even debate between police and suspect. . . .  Yet in
20  carrying out their interrogations the police must avoid threats of punishment for
    the suspect's failure to admit or confess particular facts and must avoid false
21  promises of leniency as a reward for admission or confession. . . . [The police] are
    authorized to interview suspects who have been advised of their rights, but they
22  must conduct the interview without the undue pressure that amounts to coercion
    and without the dishonesty and trickery that amounts to false promise.'
23  [Citation.]"  (<u>People v. Holloway</u> (2004) 33 Cal.4th 96, 115 (<u>Holloway</u>).)  "The
    determination whether a waiver is voluntary is one entrusted to the trial judge,
24  based on the totality of the facts and circumstances, including the background,
    experience and conduct of the accused. [Citation.]"  (<u>People v. Michaels</u> (2002)
25  28 Cal.4th 486, 512.)

26         Bolton first argues that the officers' "incessant" demands that he admit his
    involvement and their statements that they "knew" he did it rendered his
27  confession involuntary and unreliable.  Bolton's argument appears to be that he
    was coerced into confessing because the detectives were not being truthful about
28  "knowing" that he killed Michelle.  Police deception during interrogation,
    however, is not necessarily impermissible.  (<u>People v. Jones</u>, <u>supra</u>, 17 Cal.4th at

15

p. 297.) "Police trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or federal due process clause. [Citation.] Why? Because subterfuge is not necessarily coercive in nature. . . . And unless the police engage in conduct which coerces a suspect into confessing, no finding of involuntariness can be made. [Citations.]" (<u>People v. Chutan</u> (1999) 72 Cal.App.4th 1276, 1280.) Moreover, it does not appear that the detectives were being untruthful -- police were questioning J. during the same time period, and she told them that Bolton had killed Michelle.

Next, Bolton maintains that the detectives' "incessant" questioning during the "lengthy" interrogation rendered his confession involuntary. Our review of the videotape of Bolton's interrogation reveals otherwise. The interrogation lasted for only two hours, hardly "lengthy." The detectives, though insistent at times, never threatened Bolton or even raised their voices. Bolton did not appear confused or exceptionally fatigued. Much of the detectives' questioning involved background information and the sequence of events on the evening of the killing. The detectives pointed out inconsistencies between his and J.'s statements, and questioned him about his improbable claim that "some dudes" attacked his wife, yet he failed to try to help her or call police.

As in <u>Holloway</u>, "[w]e conclude the detectives in this case did not cross the line from proper exhortation to tell the truth into impermissible threats of punishment or promises . . . ." (<u>Holloway</u>, <u>supra</u>, 33 Cal.4th at p. 115.) Bolton has not demonstrated that his statements to the police were involuntary.

Cal. Ct. App. Opinion, ¶. 11-13.

In the present case, the trial court made findings from the facts adduced at the pretrial hearing on Bolton's motion to exclude his confession and reasonably determined that his confession was voluntary -- the product of an essentially free and unconstrained choice. As explained above, the state appellate court independently reviewed the determination of the trial court on the ultimate issue of voluntariness and found that Bolton had not demonstrated that his statements to the police were involuntary. After a careful review of the record and relevant cases, this Court is satisfied that the state courts' findings were not "objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 63 (2003); <u>id.</u> at 75 (While the "objectively unreasonable" standard is not self-explanatory, at a minimum "it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them.").

As explained above, a federal court may grant the writ if it concludes that a state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A district court must presume correct any determination of a factual issue made

16

by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to intrinsic review of a state court's fact-finding process, or situations in which petitioner challenges the state court's fact-findings based entirely on the state court record, whereas section 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).  In Taylor, the Ninth Circuit established a two-part analysis under sections 2254(d)(2) and (e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of the state court's fact-finding process under the "unreasonable determination" clause of section 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  Id.  Once the state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by giving the state court finding a presumption of correctness under section 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by the petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state court finding is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)."  Taylor, 366 F.3d at 1000.  The relevant question under section 2254(d)(2) is if an appellate panel applying the normal standards of appellate review, could reasonably conclude whether or not a state court finding is supported by the record.  Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004).

At the hearing on Bolton's motion to exclude his statements, the trial court reviewed the challenged transcript and videotape before making its finding that Bolton's admissions were voluntary, stating:

> Well, I haven't reviewed the entirety of the tape again.  I have again reviewed portions of the interview, and I have deliberated further on the matter, and I am prepared to make a decision with respect to it. . . .

Here's my conclusions with respect to it. I'm still of the opinion that there was incessant questioning of the defendant by the officers. In fact, one might better characterize it as a [sic] incessant demands by the officers designed to get the defendant to admit his involvement in the crime. The question is, can such questioning amount to psychological coercion rendering statements or the admission made by the defendant involuntary?

Under certain circumstances, there's no question in my mind that under certain circumstances, such incessant questioning or demands constitute psychological coercion rendering a response thereto as involuntary.

However, after lengthy deliberation, I've concluded that that's not the case here. Any conclusions in that regard, my concluding that we don't have psychological coercion, but rather that the statements are voluntary, rest on a number of factors, including in particular the fact that the defendant knew he could have stopped the questioning at any time by invoking his <u>Miranda</u> rights. That is to say he didn't need to give an admonition to stop the questioning. Under these circumstances, the questioning loses much, if indeed not all, of its coercive character.

Additionally, the totality of the other circumstances at the interview were taken into account by me in reaching my conclusion that it's, in fact, voluntary. Given the fact that responding to all these questions and, additionally, the fact that there was no physical coercion involved here or other types of coercion involved here that I could see other than the incessant questioning, and the fact that much of this questioning was indeed occasioned by the defendant giving questionable responses to prior questioning, all the factors considered lead me to say in this case, although there was incessant questioning or demands, as I've characterized them, by the officers that you tell the truth, I do not believe that his response to that was a product of psychological coercion, as opposed to being voluntary responses. And one of the key responses, as I said, he was advised and said he understood, and I have every reason to believe he understood that he could have stopped the questioning at any time by simply invoking his rights saying, "I don't want to talk about it anymore," or asking to talk to an attorney.

So for all these reasons, I find take [sic] there was no due process violation by this incessant questioning of [sic] the circumstances in this case, and I also find that there was no <u>Miranda</u> violation for the reasons I stated.

RT 151-153.

As explained above, the state appellate affirmed the trial court's ruling and specifically found that, upon reviewing the videotape of Bolton's interrogation, no promises or impermissible threats of punishment were made to Bolton, and that Bolton did not invoke his <u>Miranda</u> right to terminate questioning before admitting his involvement in the murder.

Bolton fails to explain why the state courts' rejection of his claim was unreasonable. Bolton does not dispute that he was read his <u>Miranda</u> rights at the start of his interview, and that he stated that he understood them. RT 525-526. However, Bolton argues that he was coerced

1  into waiving his rights, and thus, his waiver was not voluntary.  Bolton premises his argument

2  on the grounds that the interrogation was "lengthy," that it took place in a "coercive atmosphere

3  of a police station in a room with only [himself], and two police detectives," and that his

4  statements were made only "after the 'incessant' demands of the officers to admit [his]

5  involvement . . . ."  (Traverse at 14.)

6      Because Bolton is challenging the state courts' determination based on the state court

7  record, the court will conduct its analysis under Section 2254(d)(2) and undertake an "intrinsic"

8  review of the state courts' processes.

9      The factfinding processes used by the state courts to determine that Bolton's admissions

10  were properly admitted into evidence were reasonable.  The trial court conducted an evidentiary

11  hearing on Bolton's motion to exclude his statements.  The state appellate affirmed the trial

12  court's ruling in a reasoned decision.  This court concludes that Bolton had a full, fair and

13  complete opportunity to present evidence in support of his claim to the state courts, of which he

14  took full advantage.  Therefore, the court finds that the state courts' factfinding processes were

15  intrinsically reasonable.

16      Upon finding that the state courts' factfinding processes survive an intrinsic review, the

17  court now turns to the state courts' findings of fact, which are "dressed in a presumption of

18  correctness."  Taylor, 366 F.3d at 1000.  These findings of fact are presumed correct unless the

19  petitioner rebuts the presumption with clear and convincing evidence.  See 28 U.S.C.

20  § 2254(e)(1); Pollard v. Galaza, 290 F.3d 1030, 1035 (9th Cir. 2002); see also Rupe v. Wood,

21  93 F.3d 1434, 1444 (9th Cir. 1996) (deferring to state appellate court's finding that challenged

22  statement did not constitute threat or promise).

23      Bolton disagrees with the state courts' findings and argues that the underlying facts can

24  be interpreted differently.  Bolton claims that the questioning was "lengthy"; the record reveals

25  that the interrogation only lasted two hours.  Bolton does not provide any authority to support

26  his implied proposition that an interrogation of that length would have a coercive effect.  As

27  explained above, the state appellate court found that the two hour interrogation was "'hardly'

28  lengthy."  Cal. Ct. App. Opinion, p. 13.

1       Respondent, relying on an Eighth Circuit case, argues that "an interrogation of

2   approximately two hours is not 'particularly lengthy.'" (Answer at 12 (citing Simmons v.

3   Bowersox, 235 F.3d 1124, 1133 (9th Cir. 2011).)   In Simmons, the Eighth Circuit also

4   determined that the coercive effect of the length of the interrogation, if any, was reduced by the

5   fact that Simmons "waived his rights at the beginning of questioning and did not later assert

6   them." 235 F.3d at 1133.  Thus, Respondent is, in essence, arguing that this court should defer

7   to the state courts' determination that Bolton's confession was voluntary and that he did not ask

8   to have the interview terminated by invoking his right to remain silent.

9       After an independent review of the record, the court is satisfied that the state courts'

10  findings are at least reasonable and therefore binding in these proceedings. See 28 U.S.C.

11  § 2254(d)(2).  Furthermore, the state courts' finding that Bolton's confession was voluntary is a

12  reasonable application of pertinent federal law under § 2254(d)(1).  See, e.g., United States v.

13  Heller, 551 F.3d 1108, 1112-13 (9th Cir. 2009) (defendant's argument that his ingestion of

14  Tylenol with codeine the morning of his confessions rendered his confessions involuntary

15  rejected:  defendant did not tell officers that he took medications, defendant appeared to be alert

16  and able, atmosphere of interview was friendly and cordial, interview was only two hours, and

17  defendant was repeatedly told that he was free to leave); Cunningham v. City of Wenatchee, 345

18  F.3d 802, 810-11 (9th Cir. 2003) (officer did not undermine plaintiff's free will where

19  interrogation lasted for eight hours and officer did not refuse to give break for food and water,

20  officer suggested cooperation could lead to treatment rather than prison, officer made statement

21  he had put people in prison for similar conduct, officer denied plaintiff's request to call therapist,

22  and plaintiff diagnosed with mental disorder and taking bi-polar medication); Clark v. Murphy,

23  331 F.3d 1062, 1073 (9th Cir. 2003) (holding that state court's determination that interrogation

24  was non-coercive, where suspect was interrogated over five-hour period in six by eight foot

25  room without water or toilet (but never requested water or use of a toilet), was objectively

26  reasonable application of Schneckloth); Pollard, 290 F.3d at 1035-36 (no coercion found in

27  police questioning that violated Miranda because the defendant initiated the conversation by

28  asking "What happened?," he showed no signs of physical discomfort, and the physical

United States District Court
For the Northern District of California

1  environment was not excessively uncomfortable).  Similarly, the state courts' determination --

2  that there was no violation of Bolton's <u>Miranda</u> right to terminate questioning because he did not

3  invoke his right before admitting his involvement in the murder -- is also a reasonable

4  application of federal law.  <u>See</u> <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1045-46 (1983) (authorities

5  may continue interrogation if suspect himself voluntarily initiates further communication).

6      Importantly, the state courts' ultimate determination -- that Bolton's will was not

7  overborne -- was not an unreasonable application of clearly established Supreme Court precedent

8  as set forth in <u>Schneckloth</u> and its progeny.  <u>See</u> 28 U.S.C. § 2254(d)(1).  After reasonably

9  rejecting Bolton's claims -- that the incessant questioning by officers constituted psychological

10  coercion as well as a violation of his <u>Miranda</u> right to terminate questioning --- the state courts

11  found that the totality of the circumstances were persuasive enough to show that his confession

12  was voluntary.   The trial court denied Bolton's motion to exclude his statements based on that

13  court's finding that there was no due process violation by the officers' incessant questioning

14  under the circumstances of this case. RT 153.  The state appellate court specifically noted that

15  the officers "did not cross the line from proper exhortation to tell the trust into impermissible

16  threats of punishment or promises . . . ."  Cal. Ct. App. Opinion, p. 11-13.  The state courts'

17  determination that Bolton's confession was not coerced must stand.

18      Accordingly, Bolton is not entitled to federal habeas relief on his claim of improper

19  admission of his confession based on the ground that it was involuntary.

20

21      **B.      <u>Waiver of Miranda rights</u>**

22      Bolton also contends that, though he was advised of his rights under <u>Miranda</u>, he did not

23  give his waiver knowingly and intelligently.  Bolton claims that he was only asked if he

24  "understood each of his [<u>Miranda</u>] rights," to which he responded, "uh-huh"; however, he argues

25  the officers "did not take the next, and crucial step of asking [him] if [he] wanted to waive [his]

26  right and talk to the officers." (Traverse at 16.)  He also argues that the officers did not ask him

27  to sign a written waiver form prior to interrogating him.  (<u>Id.</u>)

28      The government has the burden to prove waiver by a preponderance of the evidence.

21

United States District Court
For the Northern District of California

Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  To satisfy its burden, the government must introduce sufficient evidence to establish that under the totality of the circumstances, the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).

As explained above, prior to the February 25, 2004 interview, Bolton was read his Miranda rights by Detective Peixoto.  CT 459.  Bolton was also asked whether he understood his rights, to which he answered affirmatively.  CT 459.  Bolton does not allege any language or communication difficulties.  He acknowledges that a Miranda waiver need not be express in order to be effective.  (Traverse at 16.)  Essentially, Bolton contends that no implied waiver occurred here because the prosecution failed to prove that "under the totality of the circumstances, [he] was aware of 'the nature of the right being abandoned and the consequences of the decision to abandon it.'"  (Id.)  In support of his claim, Bolton states: "Because of the circumstances . . . , particularly [his] lack of criminal involvement, [his] youth, and the coercive atmosphere of the interrogation, the court erred in admitting [his] inculpatory statements in the absence of any expression of waiver of [his] Miranda rights." (Id. at 16-17.)  In essence, Bolton maintains that his statements to police made after receiving his Miranda advisements were inadmissible, for the same reasons he argues his statements were involuntary.

The state appellate court rejected Bolton's claim that he did not give his waiver knowingly and intelligently, stating:

> "'In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained. [Citations.]'. . ." (People v. Storm (2002) 28 Cal.4th 1007, 1022-1023, citing People v. Cunningham (2001) 25 Cal.4th 926, 992.)
>
> "To protect the Fifth Amendment privilege against self-incrimination, a person undergoing a custodial interrogation must first be advised of his right to remain silent, to the presence of counsel, and to appointed counsel, if indigent. [Citation.]" (People v. Stitely (2005) 35 Cal.4th 514, 535.) "After such warnings have been given . . . the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against [the individual]." (Miranda, supra, 384 U.S. at ¶. 478-479, fn. omitted.)  Miranda explained that "a

valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."  (Id. at p. 475.)

A suspect's waiver of Miranda rights, however, need not be express.  "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver.  The question is not one of form, but whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.  As was unequivocally said in Miranda, mere silence is not enough.  That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. . . .  [I]n at least some cases waiver can clearly be inferred from the actions and words of the person interrogated."  (North Carolina v. Butler (1979) 441 U.S. 369, 373, fn. omitted.)

"[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.  [Citation.]"  (Fare v. Michael C. (1979) 442 U.S. 707, 724-725.)  The totality of the circumstances approach "permits – indeed, it mandates – inquiry into all the circumstances surrounding the interrogation."  (Ibid.)  The circumstances to be considered include personal attributes of the defendant such as intelligence, level of education, and prior contacts with the criminal justice system.  (North Carolina v. Butler, supra, 441 U.S. at ¶. 374-375.)  "[W]e cannot assume from a silent record that defendant, having heard a recital of these rights, nonetheless decided to waive them.  An express statement of waiver is not required under such circumstances.  [Citation.]"  (People v. Medina (1995) 11 Cal.4th 694, 752.)

Here, Bolton maintains the "totality of the circumstances" militates against a finding of a waiver of his right to remain silent.  He claims the "interrogation was lengthy [and] took place in the coercive atmosphere of a police station," at a time when he was "23 years old[9] and had a minimal criminal record . . . ."  He also argues that the officers "repeatedly told [him] that his story was different from what his sister was telling them and that he was not being truthful . . . ."

Bolton was informed of his rights under Miranda, and responded that he understood those rights.  He then willingly answered the detectives' questions.  As fully discussed above, the record demonstrates that Bolton's admissions to police were voluntary.  On this record, waiver can clearly be inferred from Bolton's actions and words.  (See North Carolina v. Butler, supra, 441 U.S. at p. 373.)

Cal. Ct. App. Opinion, ¶. 13-15 (footnote renumbered).

Bolton contends that in making the above-described confession, his waiver of his Miranda rights was not knowing and voluntary because he did not give an express waiver and his actions did not amount to an implied waiver of his rights.

_____

[9] We note that Bolton was actually 21 years old at the time of the police interrogation.

United States District Court
For the Northern District of California

1       Where an accused is properly advised of his rights to remain silent, against incrimination,

2 and to counsel, such accused thereafter may waive those rights if his waiver is voluntarily,

3 knowingly, and intelligently made. Miranda, 384 U.S. at 471, 475. A valid waiver of Miranda

4 rights depends upon the totality of the circumstances, including the "background, experience and

5 conduct" of the defendant. United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986).

6       In the present case, Bolton was read his Miranda rights, and upon stating that he

7 "under[stood] his rights," he agreed to speak with the officers. CT 459. Such a showing, in the

8 absence of circumstances suggesting a contrary finding, is sufficient to establish Bolton knew

9 his rights and waived them knowingly and intelligently. See Paulino v. Castro, 371 F.3d 1083,

10 1086-87 (9th Cir. 2004) (holding statement by suspect that he understood his rights and wanted

11 to talk to officer sufficient to show waiver of right to counsel).

12       Bolton contends his waiver was not knowing and intelligent because he had little previous

13 contact with the criminal justice system, he was only twenty-one at the time of the interrogation,

14 and he was subjected to coercion, as discussed above. As noted, there is no factual basis in the

15 state court record to support a finding of coercion. Further, even if this court were to assume

16 Bolton had little previous contact with the system, such factor would not suffice to overcome the

17 above-described evidence that Bolton's waiver was knowing and intelligent. See United States

18 v. Amano, 229 F.3d 801, 805 (9th Cir. 2000) (holding where suspect twice advised of his rights

19 and waived them, lack of experience with justice system insufficient to void waiver).

20       Even if the state courts erred in finding that Bolton's Miranda waiver was given

21 voluntarily, knowingly, and intelligently, the erroneous admission of a confession is subject to

22 harmless error analysis. Arizona v. Fulminante, 499 U.S. 279, 306-12 (1991). In other words,

23 habeas relief is appropriate only if the coerced confession had a "substantial and injurious effect

24 or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. In the present case, as

25 explained above, Bolton was implicated by J., who testified at trial, the police found the murder

26 weapon -- the pocket knife -- wrapped within gloves, and the victim's DNA was in blood taken

27 from one of the gloves and from Bolton's jacket. Thus, it cannot be said that the admission of

28 the statements made by Bolton had a substantial or injurious effect on the verdict.

1    Accordingly, Bolton is not entitled to habeas relief on his claim of improper admission

2 of his confession based on the ground that his waiver was not knowing and intelligent.

3

4

5    **III.    Cumulative error claim**

6    Lastly, Bolton claims that the cumulative effect of various trial errors resulted in

7 prejudice.

8    Although no single trial error is sufficiently prejudicial to warrant the granting of relief,

9 the cumulative effect of several errors may still prejudice a defendant so much that his

10 conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893–95 (9th Cir. 2003).

11 However, where no single constitutional error exists, there can be no cumulative error.  See

12 Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

13    Bolton has not shown that there were any constitutional errors at trial.  Therefore, the

14 court concludes that Bolton has not shown that there was cumulative error.

15    Accordingly, Bolton is not entitled to habeas relief on this claim.

16

17                                 **CONCLUSION**

18    For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  A certificate

19 of appealability will not issue.  Reasonable jurists would not "find the district court's assessment

20 of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

21 Bolton may seek a certificate of appealability from the Ninth Circuit Court of Appeals.  The

22 clerk shall enter judgment in favor of respondent, and close the file.

23    The court also directs the clerk to substitute Acting Warden Leland McEwen as the

24 respondent in this action.  See supra note 6.

25    IT IS SO ORDERED.

26 DATED: November 17, 2011

                                         _____
27                                        SUSAN ILLSTON
                                         United States District Judge
28

25